## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | **3:23-cr-00149-MEM** |
| | **:** | |
| **v.** | **:** | **(Judge Mannion)** |
| | **:** | |
| **DAMIEN BOLAND.** | **:** | **(Electronically Filed)** |

### SENTENCING MEMORANDUM

Defendant Damien Boland, by and through his undersigned counsel, files the following Sentencing Memorandum and submits the following in support:

## I. Introduction

Thomas Trotta is a contagion of criminality. Wherever he went, he infected others with schemes that served his own criminal ends. Damian Boland was not the architect of this conspiracy. His crimes flowed from his proximity to Trotta, not from any entrenched criminal disposition of his own. Without Trotta, Mr. Boland would not stand before this Court. Without Mr. Boland, Trotta would have conned and ensnarled some other poor soul into his constant criminal enterprise.

Trotta was the ringleader. He conceived, organized, and perpetuated the thefts. He reaped the lion's share of the benefits and

drove others — including Mr. Boland — into conduct they would never have undertaken on their own. And yet, even Trotta, with his years of wrongdoing and admitted leadership role, received a sentence of 96 months of imprisonment. That sentence was not the product of Trotta's remorse, but instead product of the bargain he struck with the Government to throw his childhood friends and family under the bus.

That result sets the appropriate benchmark for this Court. Under principles of proportionality and fairness embodied in 18 U.S.C. § 3553(a), Mr. Boland's punishment cannot justly exceed Trotta's. To impose a harsher sentence on the follower than on the instigator would invert responsibility. It would suggest that the one who engineered the conspiracy, committed the burglaries, and corrupted others deserves mercy, while the one swept up in his wake deserves severity. That cannot be the measure of justice.

Mr. Boland stands before this Court with no prior record of major criminal conduct, with strong family and community ties, and with the prospect of meaningful rehabilitation. His conduct was serious, and he respects the jury's verdict. But the sentence imposed should reflect his **lesser culpability**, his **capacity for reform**, and the **need for**

**parity** with his far more culpable co-defendant. A sentence below 96 months will be "sufficient, but not greater than necessary," to accomplish the purposes of sentencing in this case.

## II. Background

Aside from his affiliation with Trotta, Mr. Boland is a fairly typical resident of Northeast Pennsylvania. He has a wife, a house and a job. (Presentence Investigation Report (PSR), Doc. 328, at ¶¶ 85-86, 95). Mr. Boland is a self-taught, self-employed tradesman, and formerly a bar owner. (PSR at ¶¶ 89, 94).

Attached hereto as Exhibit A are letters of support from his friends, neighbors and previous customers. Jason and Nina Wheeland write that they were Mr. Boland's neighbor for eight (8) years. In that time, they "found him to be respectful and trustworthy." They entrusted him to watch their pets when they were away and "felt that [they] could count on Damien if we needed help on [their] property." In short, Mr. Boland was a good neighbor.

Similarly, Joann Page describes Mr. Boland as a good and trusted friend, as "always somebody that [she] could count on." When she had health issues, Mr. Boland would drive her to and from the emergency

room. When she had difficulty maintaining her household, she entrusted Mr. Boland with her checkbook to help her pay her bills for her utilities, taxes, groceries and medications. She notes, "Not once did he ever become financially deceitful. He's always been nothing less than honorable." Ms. Page laments that when Mr. Boland is incarcerated it will bring her "great sadness" to be without him to confide in and assist her.

Ms. Page also notes that Mr. Boland did not have "the easiest life" growing up. His mother was "completely absent from his upbringing" while his "father worked as a truck driver" and "was away a lot." As a result, Mr. Boland was largely raised by his grandparents. When he was 15 years old, his father died by suicide, an event which was a "very profound" loss for Mr. Boland who was "very close" with his grandfather. When his grandmother grew older, Mr. Boland became her caretaker until her passing.

Diane Black and Joe Leonard, customers of Mr. Boland, note that he was a fair and reliable contractor. Mr. Leonard states that he knew Mr. Boland "for over 15 years, and during this time, . . . found him to be a person of integrity, reliability and honesty." Mr. Boland provided Mr.

Leonard with construction work "in a timely manner and at a fair price."

## III. Former Section USSG § 4A1.3(b)[1]

Mr. Boland has two driving under the influence (DUI) offenses from 2011 and 2018, which result in four (4) criminal history points. (PSR ¶¶ 75-76). Additionally, Mr. Boland has a criminal mischief/public drunkenness offense from 2009, which adds another point. These offenses all stem from past issues with alcohol.

During his PSR interview, Mr. Boland acknowledged a past issue with alcohol. However, as indicated in Paragraph 91 of the PSR, Mr. Boland successfully completed drug and alcohol treatment following his second DUI. During his PSR interview, Mr. Boland indicated that he no

---

[1] Mr. Boland notes that the most recent Amendments to the Sentencing Guidelines repealed most of the departures under the previous guidelines, including §4A1.3. However, the departures are still contained in Appendix B of the 2025 Guidelines, which states "[t]he removal of departures does not limit the information courts may consider in imposing a sentence and it is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)." Appendix, p. 133. Accordingly, Mr. Boland seeks an additional variance based on the factors previously contained in §4A1.3.

longer drinks with any regularity aside from occasionally having a glass of wine with dinner (at most once a month). Mr. Boland's wife agreed that his alcohol consumption is not problematic. Indeed, Mr. Boland was subject to five (5) drug screens while on pretrial release and has never had any indication of drug or alcohol use.

USSG §4A1.3(b) provided that a downward departure may be appropriate if "defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history **or** the likelihood that the defendant will commit other crimes" (emphasis added).  Here, Mr. Boland submits that his criminal history category "substantially over-represents the seriousness of the defendant's criminal history" and "the likelihood that the defendant will commit other crimes." Specifically, Mr. Boland asserts that his criminal history, which involves alcohol-related offenses, over-represents the likelihood that Mr. Boland will commit other crimes. By all indication, Mr. Boland no longer has any issues with alcohol.

Accordingly, Mr. Boland requests that the Court grant a downward variance pursuant to the considerations previously contained in §4A1.3(b) is appropriate and sentence him as if his criminal history

category was II as opposed to III. Such a variance would be consistent with treating Mr. Boland's 2009, 2011, and 2018, alcohol-related convictions as three (3) one-point offenses. If the Court grants this variance, and Mr. Boland's total offense level is 28 (based on the objection discussed in Section IV), then (with a criminal history category II), his guideline range would be 87-108 months of incarceration.

## IV. <u>Objection to PSR Guideline Calculation</u>

Paragraph 62 of the PSR includes a two-level enhancement USSG §2B1.5(b)(5). The enhancement under §2B1.5(b)(5) applies where "the defendant engaged in a pattern of misconduct involving cultural heritage resources or paleontological resources[.]" The Commentary to §2B1.5 defines "pattern of misconduct involving cultural heritage resources or paleontological resources" as "two or more separate instances of offense conduct involving a resource that did not occur during the course of the offense (*i.e.*, that did not occur during the course of the instant offense of conviction and all relevant conduct under §1B1.3 (Relevant Conduct))." Application Note 6(A). Here, the offense conduct encompasses Mr. Boland's offenses from August 1999 to

7

September 2019. (PSR, ¶ 6). As a result, all of Mr. Boland's "instances of offense conduct" concerning cultural heritage resources constitute relevant conduct pursuant to §1B1.3. Thus, §2B1.5(b)(5) is inapplicable.

The Government maintains that §2B1.5(b)(5) is unambiguous and that therefore, pursuant to *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021), the Court should not consider the commentary. However, it is not clear what constitutes a "pattern of misconduct involving cultural heritage resources or paleontological resources."

First, what is "misconduct"? Merriam-Webster's dictionary includes five (5) definitions of "misconduct," including: (1) "mismanagement especially of governmental or military responsibilities," (2) "intentional wrongdoing," (3) "improper behavior," (4) "adultery" and (5) "a penalty (as in ice hockey) for improper behavior or abusive language (as toward an official)." "Misconduct," *Merriam-Webster.com Dictionary* (Merriam-Webster, Inc.), https://www.merriam-webster.com/dictionary/misconduct (last visited Oct. 2, 2025). Setting aside adultery and sports penalties, what sort of mismanagement, intentional wrongdoing or improper behavior is sufficient? It is not clear.

Second, what is a "pattern" in this context? To take one burglary from the PSR, in the Scranton County Club burglary (¶¶ 20-22), it is alleged that Mr. Boland: (1) drove Trotta to the burglary, (2) drove him from the burglary after Trotta stole multiple trophies, (3) melted down the trophies into silver bars, (4) transported the silver bars to New York City, and (5) sold the bars in New York City. Does each of these acts in combination constitute a pattern of misconduct? Could a single burglary constitute a pattern? It is unclear based on the plain language of the guideline itself, but such an interpretation would clearly lead to an absurd result. The commentary is necessary to explain what a "pattern" is under §2B1.5(b)(5).

Moreover, in *United States v. Stimac*, the Eighth Circuit Court of Appeals, found comparable language contained in USSG § 2Q2.1(b)(1)(B) to be ambiguous. 40 F.4th 876, 881 (8th Cir. 2022)("[W]e conclude that the language of § 2Q2.1(b)(1)(B) is ambiguous."). Section 2Q2.1(b)(1)(B) provides, in offenses involving fish, wildlife, and plants, a two-level increase if "the offense . . . involved a pattern of similar violations." The Court in *Stimac* noted that there were two plausible interpretations of what a "pattern of similar violations" meant. 40 F.4th

at 880-82. On the one hand, this term could refer to a "applicable prior offenses." *Id.* at 880. Alternatively, it could mean "violations committed as part of the offense." *Id.*

The Court noted that while § 2Q2.1's application notes defined "offense," the terms "similar" and "involved" were not defined. *Id.*at 881. The Eighth Circuit considered "comparable language" contained in other parts of the Guidelines, comparing USSG § 2B1.5 with § 4B1.3 and § 2G2.2. After reviewing how, despite "comparable language," these various Guideline provisions have various interpretations, the Court concluded that the language of § 2Q2.1(b)(1)(B) is ambiguous.[2]

The same logic applies here. It is unclear whether a pattern means "applicable prior offenses" or "violations committed as part of the offense." *Stimac*, 40 F.4th at 880. Under some provisions of the Guidelines a "pattern" compares relevant conduct with prior offenses outside of relevant conduct (§ 2B1.5); whereas, for other parts of the

---

[2] In *Stimac,* the Court nonetheless applied the Guideline because under either plausible interpretation of the applicable language the enhancement would apply. 40 F.4th at 881-82. Here, in contrast, if the Court applies the Application Note 6(A) of §2B1.5, the enhancement would not apply to Mr. Boland since there are no other offense outside what is relevant conduct.

Guidelines, a "pattern" includes relevant conduct (§ 2G2.2). Thus, the

Government's argument that § 2B1.5 is unambiguous has no merit.

Section 2B1.5(b)(5) is ambiguous on its face and ambiguous compared to

similar language in other guidelines.

Finally, if the Court were to apply a §2B1.5(b)(5) enhancement, it

would constitute impermissible double-counting. As discussed above,

this enhancement could potentially apply to every case whenever there

is more than one act that constitutes "misconduct" even if only one

object is stolen. In such a scenario, misconduct is held against the

defendant as part of the relevant conduct (and the valuation table

contained in §2B1.1) and by the enhancement. Classic double-counting.

Mr. Boland acknowledges that as a general matter the Third

Circuit has held that "double counting is impermissible under the

Guidelines . . . only when the Guidelines *explicitly* prohibit" it. *United

States v. Wong*, 3 F.3d 667, 671 (3d Cir. 1993) (emphasis in *Wong*).

Here, however, the Sentencing Commission would not have explicitly

prohibited double counting under §2B1.5 as it provided the Application

Note 6(A), which implicitly precludes it. In other words, the Sentencing

Commission provided the commentary, the commentary prevents this

potential for double-counting. As a result, it would not make sense, on the one hand, to ignore the Application Note (thereby creating a double-counting issue); and then, on the other hand, to ignore the double-counting issue because the Sentencing Commission did not explicitly prohibited it.

In sum, the Court should sustain Mr. Boland's objection to Paragraph 62 and remove the two-level enhancement pursuant to §2B1.5(b)(5). As a result, Mr. Boland's guideline range should be reduced to 97 to 121 months (if criminal history category III or 87-108 months (if criminal history category II, pursuant to the variance requested in Section III).

## V. <u>Argument for Variance</u>

As set forth above, Mr. Boland submits that a sentence above the 96-month sentence Trotta received would be a miscarriage of justice. Trotta cooperated. He testified against his friends. Mr. Boland did not. However, Mr. Boland did not have a meaningful chance to cooperate. The Pennsylvania State Police met with Trotta first. Trotta told PSP all sorts of wild tales that Mr. Boland could not possibly corroborate or be

reasonably expected to dispel after the Government chose to use Trotta as their star witness.

In short, even acknowledging differences between the two defendants regarding cooperation, 18 U.S.C. § 3553(a)(6)'s admonition against unwarranted sentence disparities favors sentencing Mr. Boland in a manner such that Trotta's 96-month sentence is the ceiling of Mr. Boland's sentencing exposure. In every other relevant aspect aside from cooperation, the differences between Mr. Boland and Trotta favor a sentence below Trotta's 96-month sentence.

For instance, Mr. Boland has been on pretrial release and has reported to pretrial services for over two (2) years, since June 16, 2023, without any issue. Trotta, in contrast, repeatedly violated his pretrial release. Mr. Boland has proven that he has the capacity for reform and to live a quiet, law-abiding life. Trotta has proven psychologically incapable of avoiding a life of crime.

Relatedly, Mr. Boland has had a job his entire life, while Trotta has subsisted off burglary, grift, and fraud. Each day Mr. Boland is incarcerated is a day he would otherwise be working, and a day removed from being able to slowly pay back the restitution listed in the

PSR. Trotta, in contrast, has no hope of ever repaying his victims absent committing other crimes.

In sum, Mr. Boland respectfully requests a downward variance based on the factors discussed above, including the attached letters of support.

## VI. <u>Conclusion</u>

Damien Boland, through counsel, thanks the Court for consideration of the matters set forth in this Sentencing Memorandum, and stands ready to address at sentencing any points raised herein.

Respectfully submitted,

/s/Matthew L. Clemente
Matthew L. Clemente

*Attorney for Defendant Boland*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | **3:23-cr-00149-MEM** |
| | **:** | |
| **v.** | **:** | **(Judge Mannion)** |
| | **:** | |
| **DAMIEN BOLAND.** | **:** | **(Electronically Filed)** |

## CERTIFICATE OF SERVICE

I, MATTHEW L. CLEMENTE, ESQ., do hereby certify that this
document, the foregoing Sentencing Memorandum, filed electronically
through the ECF system, will be sent to the registered Participants as
identified on the Notice of Electronic Filing, including the following:

>James Buchanan, Esquire
>United States Attorney's Office
>
>Mark Campetti, Senior US Probation Officer
>United States Probation Office
>
>Respectfully Submitted,
>
>/s/ Matthew L. Clemente, Esq.
>88 N. Franklin Street
>Second Floor
>Wilkes-Barre, PA 18701
>(570) 266-8986

15